UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

06-CIV-22650-HOEVELER

DISABILITY ADVOCATES AND COUNSELING
GROUP, INC., and STEVEN BROTHER,

    Plaintiffs,

v.

OVIDIO LOPEZ and ENA LOPEZ,
100 - 116 S.W. 27th Avenue and
2710 S.W. 1st Street, Miami, Florida,

    Defendants.
_____/

## ORDER

THIS CAUSE comes before the Court on the plaintiff's motion to enforce the settlement of this ADA lawsuit. The motion is fully briefed and the Court held an evidentiary hearing. For the reasons that follow, the motion is granted, in part, and denied, in part.

### I. Background

#### A.

The defendants, Ovidio and Ena Lopez, own a small strip mall in Miami that was built in the 1970s. In 2006, the plaintiff filed this ADA lawsuit alleging the strip mall was not compliant with the ADA's accessibility requirements. The parties reached a Settlement Agreement November 16, 2007, which the Court approved January 7, 2008. Pursuant to the Agreement, the defendants agreed to perform

1

a list of renovations to the strip mall. The Court closed the case but retained jurisdiction over the settlement.

In March 2010, the plaintiff's lawyer, William Charouhis, visited the mall to inspect the renovations. He determined the defendants failed to comply with certain aspects of the settlement and shortly thereafter after filed a motion for Court enforcement of the settlement, seeking an injunction, attorney's fees, and liquidated damages.

B.

Paragraph 1 of the Settlement Agreement lists six general categories of renovations, which are:

¶ **1.A: Parking and Initial Access** (addressing handicapped parking spaces, access pathways, wheelchair ramps, etc.)

¶ **1.B: Retail/Commercial Spaces--Counters** (requiring lower counters in the tenant spaces, unobstructed interior pathways, etc.)

¶ **1.C: Retail/Commercial Spaces--Door Hardware & Offsets, Path of Access, Clear Floor Spaces, Reach Ranges, Signs** (governing door knobs, entry ways, doorway clearance, unobstructed indoor floor spaces, and so forth)

¶ **1.D: Public Restrooms** (governing bathroom doorways, signage, mirrors, toilet stalls, grab bars, and similar fixtures, all as required by the ADAAG guidelines)

¶ **1.E: Eating Establishment--Accessible Tables and Restrooms** (addressing the provision of handicapped-accessible dining tables and restrooms in restaurants)

¶ **1.F: Emergency notification devices** (requiring certain visual alarms and louder audio alarms)

Each general category included a number of specific

modifications, which the defendants agreed to perform according to the details and measurements in the settlement stipulation. Under paragraph 3 of the Agreement, all the improvements were to be finished by April 30, 2008, except for the public restroom improvements, which were due by October 31, 2008. Under Paragraph 5, the parties agreed that if the defendants did not meet the deadlines, they would pay as liquidated damages $50 to $200 per day until the renovations were finished. The plaintiff's lawyer also received $12,000 in attorney's fees as part of the settlement.

### C.

The plaintiff now contends the defendants breached the Settlement Agreement. In particular, the plaintiff asserts about nine specific violations, citing the relevant provisions of the Settlement Agreement. As relief, the plaintiff seeks: (1) an injunction requiring the defendants to finish the work; (2) liquidated damages of $50 to $200 per day, dating from April 30, 2008 to the date of completion; and (3) $11,540 in attorney's fees and costs.

The defendants deny they breached the settlement, because they achieved all the renovations that were "readily achievable and architecturally possible." However, the plaintiff counters that the defendants' remediation obligations are governed by the specific terms of the settlement contract, not by what is "readily achievable." Put differently, the plaintiff submits that the terms

of settlement cannot be avoided simply because the defendants might have been able to benefit from certain well-known exceptions to ADA if the lawsuit had gone to trial, rather than ended in a compromise.[1]

## II. Analysis

### A.

In March 2010, Mr. Charouhis visited the strip mall to take measurements and photographs, which he presented to the Court during the evidentiary hearing in a binder of "Plaintiff's Photographs" numbered 1 through 68. He claims the evidence demonstrates a number of violations of the Settlement Agreement. Defendants' counsel, Jose Herrera, objected to Mr. Charouhis's acting as the sole witness at the hearing, arguing that Charouhis is both biased (because his recovery of attorney's fees depends on proving violations) and unqualified to testify about topics of engineering and construction. Indeed, there is a legitimate question about Mr. Charouhis's reliability as the plaintiff's only witness on technical matters, especially where his photographs do not clearly depict the violations he is seeking to prove. On the other hand, some of his photographs capture obvious areas in which

---

[1] Of course, the Settlement Agreement is a contract that the Court must interpret like any other contract, mindful of what the parties reasonably understood their agreement to mean. For example, it would be impossible there was a "meeting of the minds" the defendants would perform renovations that were architecturally *impossible*.

the defendants failed to abide by their obligations. In those instances, the photographs speak for themselves and require no further expert verification. The Court will first address the alleged violations the plaintiff failed to prove, and then discuss the violations that are proven from the evidence presented.

B.

In Plaintiff's Photographs 3 through 9, Mr. Charouhis purports to depict a wheelchair ramp protruding from the walkway of the strip mall into the "access aisle" of a handicapped parking space. An access aisle is a painted "no parking" buffer-zone situated alongside a handicapped parking spot, wide enough to allow a person in a wheelchair to enter or exit his car. The access aisle is demarcated by two vertical stripes of blue paint, each 4 inches wide; then a serious of diagonal blue hashes between the vertical stripes. Although the wheelchair ramp in Photograph 3 extends onto the asphalted parking area, it is impossible to conclude the ramp obstructs the access aisle in violation of the settlement contract. In fact, judging from Photograph 9, the unobstructed portion of the access aisle is nearly as long as the massive four-door pick-up truck parked in the handicapped spot beside it.

Mr. Charouhis next argues the access aisle is too narrow. Under Paragraph 1.A(ii)(b) of the Settlement Agreement: "Each accessible parking space shall have adjacent thereto an access aisle which is not less than 5 feet in width in compliance with

4.6.3 and Fig. 9 of the ADAAG." The access aisle depicted in Plaintiff's Photograph 1 is plainly five feet (60 inches) across, when measured from the outer edges of the blue-painted stripes. At the hearing, however, Mr. Charouhis suggested the aisle is actually only 56 inches wide, because the correct technique for measuring its width is "center line to center line"; in other words, starting the measurement from the center of the blue stripe on one side, and measuring to the center of the blue stripe on the other side, rather than measuring from their edges. This approach naturally shaves off about four inches from the final measurement, since the blue stripes are each four inches wide. Oddly, Mr. Charouhis failed to explain why the Court should endorse the "center line to center line" measurement, even though it is not mentioned by Section 4.6.3 or Figure 9 of the ADAAG, which simply require the access aisle to be 60 inches wide. Considering Mr. Charouhis's history litigating ADA cases, one presumes he had some basis for arguing in favor of the 56-inch measurement. But he cited no authority for that technique, and the Court finds none.

Similarly, Mr. Charouhis failed to tender convincing evidence that the access aisle, as well as some of the wheelchair ramps in the strip mall, were too steep. A number of photographs depict Mr. Charouhis's digital level resting upon the ramps, showing readings that exceed the pitches and slopes required by the Settlement Agreement. Upon cross examination, however, Mr. Charouhis conceded

that he was unfamiliar with the applicable industry standards for measuring and calculating the slope of a ramp. Hearing Trans. 43-46, Aug. 30, 2010, ECF No. 56. Needless to say, precision and uniformity in this area are crucial, especially since most of the ramps in question are allegedly defective by a matter of millimeters, and it is undisputed they were recently installed by the defendants' engineer *after* the Settlement Agreement and for the specific purpose of complying with the ADA. Considering the ramps were constructed by a licensed professional in conformity with the building codes--whereas Mr. Charouhis is an unlicensed layman who apparently failed to perform the standardized measurements and calculations (or at least failed to document that he performed them correctly)--the Court cannot conclude that the engineering of the access aisles and/or wheelchair ramps is defective under the Settlement Agreement.

Continuing on, the plaintiff argued that several of the stores in the mall were non-compliant with Paragraph 1.B(i) of the Settlement Agreement, which requires tenants to install handicapped accessible counter-tops and/or payment counters. Specifically, each retail, commercial, or food-service location must provide a "lowered, accessible portion of the payment/service counter or an accessible writing/work surface" that is no higher than 36 inches above the finished floor. Mr. Charouhis submitted photographs of several stores whose counter-tops were clearly higher than 36

7

inches. By way of rebuttal, however, the defendants draw attention to the "adjacent premises" clause in 1.B(i)(b) of the Agreement, which relieves each tenant from installing its own 36-inch counter provided there be "a permanent accessible desk/writing surface adjacent to the present retail/commercial counters available for use by the public." It is uncontested that the strip mall's 24-hour laundromat features a permanent counter-top meeting the size and height requirements of Paragraph 1.B(i). The defendants argue the laundromat's counter-top is "adjacent" to all of the commercial spaces that lack their own, and therefore fulfills the counter-top requirement under Paragraph 1.B(i).[2] Although Mr. Charouhis acknowledges that at least one or two qualifying counter-tops in the mall are made available to all of the strip mall's patrons (Trans. 56), he nevertheless denies the possibility that those counters could be considered "adjacent" under Paragraph 1.B(1)(b). Trans. 42:19-20.[3] Black's Law Dictionary defines "adjacent" to mean: "Lying near or close to, but not necessarily touching." Considering the small size of the strip mall (approximately 8,000 square feet), and that it contains only ten to twelve businesses,

---

[2] Defendants presented evidence there is at least one other 36-inch counter-top in the mall, as well, which patrons of any store are entitled to use.

[3] At one point Mr. Charouhis claimed that each establishment needed its own 36-inch counter-top regardless of what was adjacent, plainly in contradiction of Paragraph 1.B(i)(b) of the contract. Trans. 56:22.

all of which are "mom and pop" stores no larger than 600 to 800 square feet (Trans. 41-42), it is certainly plausible that the laundromat's counter-top meets the requirements of Paragraph 1.B(1)(b). Thus, Mr. Charouhis has not tendered evidence to prove a violation of this aspect of the agreement.

Lastly, Mr. Charouhis presented interior photographs that allegedly depict obstacles in two of the stores, which prevent a wheelchair from reaching all parts of the floor space. Under Paragraph 1.C(iv) of the Agreement: "In each retail/commercial space, there shall be a clear, unobstructed accessible path of access, of at least 36 inches in width, to throughout the areas of retail/commercial space open to the public." Photograph 30, which was taken inside what appears to be a thrift store or haberdashery, shows two moveable wicker chairs situated less than 36 inches apart, ostensibly blocking a wheelchair pathway. Photograph 31 from the same store shows a measurement of 20 inches between the edge of some hanging garments and a portable clothing rack, again purporting to show a barrier for wheelchair users. In the same vein, Photograph 46, an interior shot from a doctor's office, shows that the entrance to a tiny nook in the waiting area, which contains nothing but two chairs, is partially obstructed by a third waiting chair. The Court does not read the Settlement Agreement to require proprietors to redesign their relatively cramped tenant spaces so that, for example, a wheelchair user could travel

throughout the store without so much as brushing against a hanging garment. Nor does Paragraph 1.C(iv) mandate unfettered wheelchair access to every unimportant interior nook that has no attraction whatsoever worth reaching. In the case of the doctor's officer, a wheelchair user would at most be prevented from sitting in one of the two non-handicapped waiting chairs. The plaintiff has not proven a violation of this aspect of the Settlement Agreement.

C.

Some of the defendants' violations of the Settlement Agreement are obvious from the photographs in evidence. With reference to Plaintiff's Photograph 12, the plaintiff points out that one of the wheelchair ramps at the strip mall lacks the necessary handrails required by Paragraph 1.A(iii), which states, in part: "Each [public use ramp] shall also have handrails on both sides, complying with 4.8.5 of the ADAAG." In turn, guideline 4.8.5 of the ADAAG provides that: "If a ramp run has a rise greater than 6 in (150 mm) or a horizontal projection greater than 72 in (1830 mm), then it shall have handrails on both sides." Photographs 14 and 15 demonstrate the ramp in question is greater than 72 inches, yet it lacks handrails. Mr. Herrera did not address this deficiency at the hearing, and it is therefore uncontested the defendants breached their obligation to install handrails.

Next, referring to Photographs 63, 64, and 65, the plaintiff points out that the entryway to tenant space 112 does not comply

with the wheelchair clearance minimums under Paragraph 1.C(ii). The defendants did not respond to this evidence at the hearing, and it again appears beyond doubt that the clearance requirements have not been achieved in that tenant space.

Finally, the plaintiff tendered evidence establishing that the defendants breached the terms of settlement governing doorway hardware and handicapped restrooms. Specifically, the defendants breached their obligations under: (1) Paragraph 1.C(i), which requires "Accessible Door Hardware" on all entry doors and interior doors used by the public; (2) Paragraph 1.D(i)(a), which mandates a particular form and location for "Accessible Restroom Signage"; (3) Paragraph 1.D(i)(j), which requires the defendants to post signs at non-handicapped restrooms indicating the location of the nearest handicapped-accessible restroom; and (4) Paragraph 1.D(i)(h)(3), which requires handicapped bathrooms to have grab-bars.

At the hearing, Mr. Herrera conceded some of these non-conformities. He argued, however, they should not be treated as material violations of the Settlement Agreement, because Ovidio and Ena Lopez repeatedly installed the necessary door hardware, signage, grab bars, and so forth, but each time the fixtures were installed, they were promptly removed by vandals. As an example, Mr. Herrera introduced January 2010 photographs of the handicapped bathroom at tenant space 106-C, which shows that grab bars were

11

installed at that time. Defendants' counsel claims they were later stolen, to be sold as scrap metal.[4] He also represented that his clients continue to work toward replacing the necessary signs and hardware each time they are vandalized. Unfortunately, even if the defendants had testified or submitted affidavits about the incidents of vandalism and/or their efforts to protect and maintain the property, it would still be impossible for them to credibly disclaim responsibility for all of the non-conformities captured in the plaintiff's photographs.

Under Paragraph 5 of the Settlement Agreement, the plaintiff "shall be entitled. . . to obtain injunctive relief from the Court to compel compliance with the terms of this Stipulation for Settlement." Apart from denying their breach, the defendants have not offered any argument why injunctive relief should not be granted. Because the plaintiff has proven the defendants failed to make certain necessary renovations, the plaintiff's motion for enforcement of the settlement is granted, on the limited basis discussed in this Order. Specifically, the defendants must complete the remediations discussed in Part II.C of this Order within 90 days.

### D.

The plaintiff also seeks attorney's fees and costs under

---

[4] The depiction is consistent with Mr. Charouhis's photographs of the same bathroom in March 2010, revealing the spot where the grab bars were torn from the wall.

Paragraph 5 of the Settlement Agreement, which provides, in part, that "in the event the modifications and alterations are not completed timely, Defendants shall pay all additional attorneys' and expert's fees and costs incurred by Plaintiffs subsequent to the execution of this Stipulation for Settlement." In support of his request for fees and costs, Mr. Charouhis submitted four pages of billing sheets, marked as Plaintiff's Exhibit 3. He claims 27 hours of recoverable time on the case, at the rate of $425 per hour, for a total of $11,475. He also claims $65.61 in recoverable litigation costs.

At the hearing, the lawyers disputed the time-frame of Mr. Charouhis's recoverable fees. According to Mr. Charouhis, Paragraph 5 entitles him to receive attorney's fees dating back to November 16, 2007--when the parties initially signed the Settlement Agreement--regardless of whether his legal fees pertained to *enforcing* the settlement. For example, Mr. Charouhis claims compensation for the time spent wrapping up the case prior to the Court's Order approving settlement on January 8, 2008.[5] On the other hand, Mr. Herrera points out that Mr. Charouhis was compensated for this work in 2007 and 2008 when he was paid $12,000

---

[5] Mr. Charouhis's November 15, 2007 time-entry for the five hours attending a settlement conference before Magistrate Judge Palermo (at the cost of $2,125) is obviously not recoverable, because November 15 was even not "subsequent to the execution" of the Settlement Agreement. The plaintiff signed and dated the Agreement on November 16, 2007.

under Paragraph 6 of the Settlement Agreement.

The Court agrees with the defendants and will not consider Mr. Charouhis's time entries pre-dating March 3, 2010 (totally $3,145). Mr. Charouhis's time from March 3, 2010 forward is recoverable, with one exception. Mr. Charouhis seeks payment for two hours of work on May 17, 2010, which is described, in part, as: "Legal research regarding 'readily achievable' and 'architecturally possible' issues raised by Defendants." These issues are elementary ADA law, and this situation did not call for any particular research into them. Because Mr. Charouhis is seeking an hourly-rate commensurate with a that of seasoned specialist, he is expected to exhibit the knowledge and efficiency of one. The Court will discount his May 17, 2010 billing entry by one hour's worth of fees ($425). After these deductions, Mr. Charouhis's recoverable fees and costs in prosecuting this enforcement motion will be $7,970.61, payable by the defendants within 30 days.

### E.

Finally, the plaintiff seeks liquidated damages for the defendants' breach of the settlement contract. Paragraph 5 includes the relevant damages provision:

> the parties agree that in the event the alterations and modifications required hereby are not timely completed in all respects, Defendants shall pay Plaintiffs as liquidated/ consequential damages a sum of no less than $50.00 per day and no more than $200.00 per day until said alterations and modifications are complete. The appropriate amount to be

> awarded within that stipulated range will be determined by the Court in relation to the severity of Defendants' non-compliance.

First, it should be noted that the plaintiff waited two years after the completion deadline to inspect the property. This certainly did not advantage the plaintiff's ability to seek liquidated damages. Under Paragraph 3, the renovations (except for the bathroom work) were due by April 30, 2008. The next sentence of the contract, in Paragraph 4, allows the plaintiff's lawyer inspect the building "to verify **commencement, progress and completion** of the work required hereby" (emphasis added). The next sentence, in Paragraph 5, then dictates the damages for each day the work continues beyond the targeted completion date. Reading the provisions in sequence, and giving due consideration the language used to qualify the plaintiff's inspection right ("to verify commencement, progress and completion of the work"), it appears their understanding was **not** for the plaintiff to wait until two years after the completion deadline to finally show up for the inspection--then, upon noticing various compliance issues, seeking two years' worth of liquidated damages.

In any event, in view of all the circumstances, "the severity of the Defendants' non-compliance" under Paragraph 5 falls squarely in the "not severe" category. They performed most of the work anticipated by the settlement, including the installation of wheelchair ramps, parking areas, counter-tops, bathroom fixtures,

15

and signs--albeit with some shortcomings. According to Mr. Herrera, the defendants (who are elderly) continue to make efforts to force their tenants to comply with the terms of settlement regarding the interior spaces. Even a low-end penalty of $50 per day of non-compliance would result in a liability of tens of thousands of dollars, which could quite realistically be financially ruinous. More importantly, under the circumstances, damages of that size would be penal in nature, bear no relation to the severity of the defendants' breach, and bear no relation to the uncertainty of the damages the plaintiff might be expected to incur as a result of the defendants' breach. If Mr. Brother or anyone from the Disability Advocates Counseling Group was damaged by on-going access barriers at the strip mall after April 2008, or if they were sustaining an ongoing damage reasonably valued around $50 to $200 per day, the non-compliance issues at the mall would have been discovered and brought to the Court's attention much sooner.

The Court concludes the liquidated damages provision does not apply to this dispute. The defendants shall instead pay to the plaintiff breach-of-contract damages in the amount of $1,000. This sum shall be paid to the plaintiff within 30 days from the date of this Order.

### III. Conclusion

In view of the foregoing discussion and conclusions, it is hereby ordered and adjudged:

1. The plaintiff's motion to enforce the settlement is granted, on the limited basis described in this order. The defendants shall complete the modifications and alterations described in Part II.C of this Order within 90 days.

2. The plaintiff's motion for attorney's fees and costs is granted. Mr. Charouhis shall be entitled to recover $7,970.61 as the fees and costs for prosecuting this enforcement proceeding, payable by the defendants within 30 days from the date of this Order.

3. The defendants shall pay the plaintiff damages in the amount of $1,000, for their failure to meet their obligations under the Settlement Agreement.

**DONE AND ORDERED** in Miami, Florida, March 24, 2011.

_____
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE